Philip Kastel v. Commissioner.
Kastel v. Commissioner
Docket No. 105129.
United States Tax Court
1945 Tax Ct. Memo LEXIS 44; 4 T.C.M. (CCH) 1006; T.C.M. (RIA) 45333; November 6, 1945
*44 1. Under mandate of the Circuit Court of Appeals for the Fifth Circuit, holding that burden of proof rests on respondent to show that petitioner and Costello were the equal partners operating the Bayou Novelty Company, when petitioner reported his income therefrom as one of four partners therein, Held, respondent failed to sustain his burden of proof and, therefore, deficiencies so based are not approved. 2. Held, further, petitioner is liable for tax on the entire amount received by him from Bayou Novelty Company, notwithstanding an agreement under which he divided his share with another. Burnet v. Leininger, 285 U.S. 136
3. Held, further, on the facts, that petitioner was domiciled in Louisiana during 1936 and 1937 and thus entitled to report his income on a community property basis, Louisiana being a community property State. Albert B. Koorie, Esq., for the petitioner. James L. Backstrom, Esq., Homer J. Fisher, Esq., and Earl C. Crouter, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $150,523.36 and $145,563.89 in the income taxes of the petitioner for the years *45 1936 and 1937, respectively. He also imposed fraud penalties of $75,261.68 and $72,781.95 for the same respective years. The case was originally heard by the Board of Tax Appeals on February 23, 1942. The issues there presented were: (1) Whether or not the petitioner had understated his income because he had reported it as his distributable share of a partnership composed of four individuals, where as it should have been reported as his share of a partnership composed of two individuals; (2) Whether or not he was entitled to report his income for the taxable years on a community property basis; (3) Whether or not the fraud penalties were properly imposed. At the hearing the respondent's counsel conceded that the Bayou Novelty Company, a partnership, reported all income earned by it for both years; that all individuals composing such partnership, as set forth in its returns, reported all income earned and reported by the partnership for both years; and that the Commissioner's determination of the deficiencies was based on his determination that the partnership was composed of the petitioner and Frank Costello as equal partners. On July 30, 1942, the Board entered its decision *46 based on its memorandum findings of fact and opinion entered on June 1, 1942, and holding that the petitioner had failed to overcome the presumption of correctness accorded to the respondent's determination of the deficiencies; that the petitioner had failed to establish that he was domiciled in Louisiana during the taxable years; and that the respondent had failed to sustain his burden of proving fraud. On appeal, the Circuit Court of Appeals for the Fifth Circuit reversed and remanded the case for further proceedings not inconsistent with the views expressed in its opinion of June 17, 1943. . The Board had held that although the burden of proving fraud rested on respondent, the burden of proving the deficiency erroneous rested on petitioner. The court held that the charge of making a false return was tantamount to a charge of fraud and that the burden of proof was on the respondent. The court then stated: We agree with the taxpayer that the charge that his partnership had made a false return asserting that the income of the partnership was divided among four persons when in fact it was divided between two, the taxpayer and *47 another, and the imposition of fraud penalties because of the false returns, amounted to a charge of fraud and the burden of proving same is on the one making the charge. After having admitted that the partnership had returned all its income; that the partners named in the return had collectively reported all of the income; and that the deficiency was based upon his finding that the return was false and fraudulent in that the partnership had two instead of four partners, the Commissioner cannot compel the taxpayer to go forward with evidence to exonerate himself of a charge of fraud or dishonesty in the absence of any evidence tending to prove fraud or dishonesty. An indictment by the Commissioner is not evidence. The Commissioner had imposed fraud penalties, which the Board of Tax Appeals did not sustain, but the case clearly presented to the Board an issue of fraud. The elimination of fraud penalties, either in or before the final order, would not have eliminated the fact that the taxpayer was charged with making false returns. The court further held that the facts made out a prima facie case of domicile in Louisiana "at least for the year 1937," and then stated: We do not *48 hold that prima facie proof of domicile in New Orleans for the year 1936 was presented by the petitioner. The burden was on him to do so before he can avail himself of the advantages of reporting income on the community basis under the law of Louisiana. Since, however, the case is to be reversed and remanded for the error of the Board in holding that petitioner had the burden of proof on the issue of fraud and for the holding of the Board that prima facie proof of domicile in Louisiana for the year 1937 had not been made out, and since it appears that the facts were not adequately developed on the whole case, it seems appropriate that the entire controversy should be reversed and remanded to the Tax Court for further proceedings not inconsistent with the views herein expressed. Upon this state of the record, therefore, the issues now before us are: (1) Whether the petitioner correctly reported his income from the partnership as one of four partners thereof, the burden of proof, under the mandate of the Circuit Court of Appeals, resting on the respondent, and (2) Whether the petitioner was domiciled in Louisiana during the taxable years. The burden of proof of this issue is on *49 the petitioner. The respondent has attempted to present a new issue of fraud, based on the deduction of certain items of expense but, as we will note in the opinion, this issue was not timely presented nor do we deem it worthy of consideration. Findings of Fact Upon the rehearing an extensive record was compiled (containing over 1,000 pages of testimony and several hundred exhibits) but under the first issue, as narrowed by the language of the appellate court's opinion, we have summarized the facts rather briefly, as follows: The petitioner is an individual who claimed to have resided, and to have been domiciled, in Louisiana during the years 1936 and 1937. He filed his income tax returns on the community property basis for the taxable years with the collector of internal revenue for the district of Louisiana, as hereinafter set forth. The return for 1936 reported $78,955.83 as income received from the Philip Kastel partnership and $33,573 as commissions received from William Whitely and Company. The return for 1937 reported $66,461.94 received from the same partnership and $31,929.30 from the Whitely Company. The Philip Kastel partnership was claimed to consist of Philip *50 Kastel and Frank Costello. The Bayou Novelty Company, hereinafter called Bayou, was a partnership which filed its partnership income tax returns with the same collector for the fiscal year September 1, 1935 to August 31, 1936; for the period from September 1, 1936 to June 20, 1937, and for the period from June 20, 1937 to March 31, 1938. For the period from September 1, 1935 to June 20, 1937, it listed its partners and their respective shares as Philip Kastel, 30 per cent; G. R. Brainerd, 30 per cent; Dudley Geigerman, 20 per cent; and Harold Geigerman, 20 per cent. G. R. Brainerd died on June 20, 1937. Thereafter the partners and their shares were listed on the last-named return as Philip Kastel, 40 per cent; Dudley Geigerman, 25 per cent, Harold Geigerman, 25 per cent, and James Brocato, 10 per cent. The Philip Kastel partnership returns reported, in equal shares between the petitioner and Frank Costello, the income reported by Bayou as the distributive share of the petitioner. The petitioner and his wife (under the name of Mrs. Philip Kastel) filed their income tax returns for the taxable years on the community property basis, each reporting one-half of the income derived *51 from Bayou ($78,955.83 and $66,491.94 for the years 1936 and 1937, respectively) and also from the commissions from William Whitely and Company received each year. Frank Costello filed his individual income tax returns for the taxable years with the collector of internal revenue for the third district of New York, showing as his distributive share of the Philip Kastel partnership the same aggregate sums as those reported by the petitioner and his wife. Brainerd and his wife, Brocato and his wife, Dudley Geigerman and his wife, and Harold Geigerman and his wife all filed their returns on the community property basis and reported the distributive shares of the husbands, as shown on the Bayou returns. Prior to 1935, the petitioner had known Costello for about eight years. Each operated some slot machines in New York independently of the other. Costello and the petitioner, together with others, also operated such machines through the Midtown Company, whose territory was in the midtown section of that city. During the early summer of 1935 Costello and the petitioner were in New Orleans investigating the prospects of establishing a slot machine business there. Costello was not favorably *52 impressed with the outlook. He told the petitioner that he was friendly with Senator Huey Long; that there would be a possible license or tax on each machine to go into some kind of a fund; that he did not want any part of the enterprise but that the petitioner could go ahead and start operation. Thereafter the petitioner went to New Orleans to make a survey of the situation and decided to enter the field. He discussed the matter with G. R. Brainerd and Costello. The petitioner had known Dudley Geigerman and Harold Geigerman for about 15 years. They both had been engaged in the slot machine business in New York. Brainerd invited the Geigerman brothers to come to New Orleans. The petitioner, in the Fall of 1935, formed a partnership with G. R. Brainerd, Dudley Geigerman and Harold Geigerman under the name of Bayou Novelty Company. In that partnership the petitioner and Brainerd each had a 30 per cent interest and Dudley and Harold Geigerman each had a 20 per cent interest. Brainerd died on June 20, 1937, and thereafter the petitioner acquired a 40 per cent interest, Dudley and Harold Geigerman each a 25 per cent interest, and James Brocato a 10 per cent interest in the partnership. *53 At the inception of the partnership the petitioner was assured that he would not have to do much work in the venture. He was in the whiskey business at the time and did not care to be known as also engaged in a slot machine enterprise. The operation of slot machines was illegal in Louisiana. Brainerd was made manager and proceeded to organize the business. He had the aid of the Geigerman brothers, who also worked in the filed making collections and checking on the collectors. After Costello expressed his displeasure with the prospects of the outlook for starting slot machine business in New Orleans, the petitioner stated that he would go ahead without Costello. Later petitioner agreed that he would divide with Costello equally whatever money he should make out of the venture. The petitioner was short of money and borrowed from Costello $15,000 which he invested in the Bayou business. Brainerd contributed some cash and the Geigerman brothers paid in over $7,500 for the benefit of the business. The petitioner went to Chicago to obtain slot machines from Jennings and Company which had previously sold him such machines, and to arrange to purchase "Chief" machines on credit to be *54 used by Bayou. The account was set up on the Jennings Company books as "Harold Miller. D/B/A (doing business as) Bayou Novelty Company" and the notes involved in the sales were to be made out and signed by Miller. Repair parts were also so sold and recorded. The account was guaranteed by the petitioner, who signed such guaranty in the amount of $25,000. The Jennings Company looked directly to the petitioner for the payment of the first order of from 875 to 1,000 machines and for subsequent orders. Later, when payments were to be made on the notes or his signature to certain papers was required by Jennings and Company, Harold Miller became known, and was identified as, Harold Geigerman. The business of Bayou was very successful and suffered no appreciable loss from "hi-jacking" or enforcement officials. Bayou operated many machines. At one time it returned 875 used "Chief" machines and purchased 1,000 new ones with a special front. The first shipment of the machines was made to Bayou in August 1935. Bayou began business about September 1, 1935 and continued in operation until the spring of 1938. Its place of business was located at 2601 Chartres Street and consisted of an office, *55 a repair shop, and store room. Brainerd acted as manager, Jack Altman was the bookkeeper and Pickert the repair man. Fifteen or sixteen teams, or pairs, of collectors or agents gathered the proceeds from the machines three times a week. Of such proceeds, Bayou received 50 per cent, the store in which the machine was placed received 40 per cent, and each team of collectors 10 per cent. Numerous relatives of Costello were sent to New Orleans by him to work for Bayou because the jobs were open and he wanted them to go to work. Several relatives of the petitioner were also employed by Bayou. Dudley and Harold Geigerman acted as collectors and also made talks to the other agents. They had free access to Bayou's private office, a privilege denied to other collectors. Upon Brainerd's death Dudley Geigerman became manager. The petitioner, Costello, and Harold Geigerman all agreed on his selection. Costello had no direct interest in Bayou but the petitioner and Costello discussed the various problems of Bayou's business. The petitioner received money from Brainerd from time to time through altman or Brainerd or it would be sent to him in New York. Distributions were made in cash. The petitioner *56 gave or sent to Costello 50 per cent of the profits received by him from Bayou. The petitioner relied on Altman or Brainerd to pay his proper percentage of the Bayou profits. The petitioner's accountant, Murphy, checked the company's books. The petitioner kept his own private record of all receipts from Bayou. Upon executing their social security applications, Dudley Geigerman and Harold Geigerman stated that their employer was Bayou. The payroll lists of Bayou, as submitted to State and Federal authorities by the accountant for the company, excluded their names with the notation "out." The work sheet of the accountant bore a corresponding notation "not taxable - partner of firm." The relations of Dudley Geigerman and Harold Geigerman to Bayou and their activities as collectors for it, were recorded in its books in the same manner as the similar activities of the other collectors. In Bayou's amended returns "commission" items of Dudley Geigerman and Harold Geigerman were excluded from expenses. In their capacity as partners, their transactions with, interest in and withdrawals from Bayou were likewise recorded. They received their share of the partnership's profits. From November 12, 1935, to *57 November 12, 1940, Harold Geigerman and Mae Geigerman held a safe deposit box, to which deposits would be made on Mondays, Wednesdays and Fridays. Dudley Geigerman and Elsie, his wife, also had a similar box, to which deposits were usually made on or just after route collections. When the petitioner and Brainerd were in New York they first discussed the advisability of starting a slot machine business in New Orleans. Brainerd was not in New Orleans when the petitioner and Costello were first there together. Brainerd knew the territory and seemed to be well acquainted in the city. Brainerd advised the Geigermans to go to New Orleans. He had known them previously in New York. The books of Bayou showed net earnings for 1936 as $514,272.25, distributed to the petitioner and Brainerd in the sums of $154,281.67 each and to Dudley and Harold Geigerman in the sums of $102,854.45 each. These amounts were 30 per cent, 30 per cent, 20 per cent and 20 per cent, respectively, of the distributable amount. Similar entries relating to undistributed earnings also appear. Bayou's books also contain an account headed "H (Miller) Geigerman." Bayou's books show eight items representing money paid *58 to Henry Lang in September, October and November, 1935, and aggregating $17,280. This sum was charged to expense and was taken into account in Bayou's income tax return for 1936. Likewise, an item of $5,500 was treated as a deduction in its accountant's work papers from which such return was prepared. The same accountant assisted in the preparation of the income tax returns of the petitioner, Bayou and several partners herein mentioned. Income tax advice was given to the petitioner by Costello's accountant in New York. The petitioner's income tax returns for 1936 and 1937 were not false or fraudulent and were not made and filed with the intent to evade tax. The record discloses the following facts relating to the petitioner's [1] domicile. In 1933 the petitioner supplied the money for the purchase of real estate at Ingleside Road near Stamford. Connecticut. The original tract consisted of 13 acres of land, on which were a barn and a few shacks. In April, 1937, an adjacent tract of about 14 acres was purchased. The property was conveyed to Elsie Kastel, *59 the petitioner's wife, and the title thereto remained in her during the years 1936 and 1937. In 1933 Mrs. Kastel constructed a residence on the land and the latter part of that year, in 1934, she, her mother, her sister and her husband, petitioner herein, moved in. Three servants were employed. At that time the petitioner's principal place of business was in New York City. In 1938 he offered the property as security for a loan of $40,000 or $45,000. The agent of the prospective lender estimated the land at $35,000 and the buildings at $50,000. The petitioner had estimated the total cost of the property at over $100,000. During June or July of 1935 the petitioner, who became a partner in Bayou in August, 1935, went to New Orleans to survey the prospects of establishing the Bayou business and registered at the Roosevelt Hotel in New Orleans. At that time those prospects were uncertain and remained so for some weeks, so that the petitioner had not determined that it was worth his while to stay in New Orleans. In the fall of 1935 he decided to remain in that city. He closed the Stamford house, which had been designated his summer home, in about October, 1935, and he and his wife brought *60 to New Orleans some of their belongings, including some books, winter clothing, etc., contained in numerous trunks, and prepared to stay and live in that city. His automobile was shipped by rail. Certain household furniture, rugs, books, etc., in the house at Stamford were covered to afford proper protection. On October 21, 1935, the petitioner and his wife registered at the Bienville Hotel in New Orleans. They occupied a suite of three rooms which, at his request, were converted into a housekeeping apartment, consisting of a living room, bedroom, dining room and kitchen, at a rental of $300 a month. They became permanent guests of the hotel, having most of their meals in their apartment. They remained at that hotel until March 30, 1936, when they moved to the Roosevelt Hotel, in which they lived as permanent guests in Room 980, at $90 a month. On August 20, 1936, they moved to Suite No. 620, which they occupied until November 8th, at $12 a day. While at the Roosevelt Hotel, the petitioner and his wife had their meals at various places in the city, sometimes at the hotel. The hotel made almost daily charges against the petitioner for restaurant, valet, laundry, telephone and other *61 such services. At certain intervals the petitioner was away from the city for short trips and no service charges were then made. On November 8, 1936, the petitioner and his wife moved to the Ponchartrain Hotel, an apartment hotel, and occupied Apartment No. 903 therein under a lease executed October 23, 1936. On April 22, 1937, the petitioner leased Apartment No. 1003 from May 7, 1937, to May 31, 1938, and renewed that lease from June 1, 1938. to June 1, 1939. Apartment No. 903 was a full housekeeping apartment, consisting of a bedroom, living room, sun parlor, dressing room, bath room, dinette and Kitchen. Apartment No. 1003 was similar to No. 903, except that the former was air conditioned. In all of these leases the petitioner is described as "of the city of New Orleans." From November, 1936, throughout the year 1937, the petitioner made almost daily purchases of food while he and his wife were at the Ponchartrain Hotel. During 1936 the petitioner opened various charge accounts with merchants in New Orleans. A private resadentil telephone was installed for the petitioner's use at the Bienville, Roosevelt and Ponchartrain hotels. The petitioner was in New Orleans almost continuously *62 during 1936 and 1937. He made occasional business trips out of the city and was sometimes in the summer home at Stamford. The petitioner never purchased a home in New Orleans but inspected several properties, which he found too small, or otherwise not suitable for their purpose. In the latter part of 1935 the petitioner discussed with others his plan to make his home in New Orleans. During that year he finally determined to make his home in New Orleans and so declared to various persons. Prior to coming to New Orleans the petitioner was connected with William Whitely and Company of London, a concern having an office in New York City. The petitioner promoted the sales of the different brands of whiskey distributed by that company. He kept in touch with this office by telephone and correspondence. Prior to 1936 petitioner had filed his Federal income tax returns with the collector of internal revenue for the district of New York and had paid income taxes to the state of New York. On March 2, 1936, he filed his Federal income tax return for the year 1935 with that collector and gave the Hotel Lexington, New York City, as his address. He was advised by his accountant that it was necessary *63 to have a New York address as that income was earned in the state of New York. When shown his return for the year 1935 the petitioner stated that at that time his home was in Stamford and that this address was used for mailing convenience. During most of the time in 1936 and 1937 the petitioner was attending to his business in New Orleans. He and his wife spent Thanksgiving and Christmas days in that city in 1935 and 1936. When they went to New York City they registered at the Carlyle Hotel. The registration cards in that hotel showed their address as Stamford, Connecticut. During 1936 and 1937 the petitioner's principal place of business was New Orleans. On September 19, 1939, in his testimony before a Grand Jury, the petitioner stated that his home address was at Stamford; that he had lired there on that date and he had had the place (a residence) since 1933, with the exception of the time when "we closed it and moved down here" (meaning New Orleans). During 1936 and 1937 the petitioner's permanent residence and his home were in New Orleans. During those years his wife maintained a summer home in Stamford. The petitioner stayed there occasionally for short periods, once while *64 recuperating from a tonsilectomy. During 1936 and 1937 the petitioner registered for poll tax in the Parish of Orleans, La. He so registered, not particularly to vote, but also for business reasons. Mrs. Kastel paid personal property taxes on property in New Orleans during 1936 and 1937. The petitioner paid income taxes to the state of Louisiana for the taxable years, and to no other state. The petitioner also paid taxes on an automobile to the city of Stamford and his wife paid taxes on an automobile and other personal property and on the real estate in Stamford. During the taxable years the petitioner registered and paid poll tax in no other state than Louisiana. On March 6, 1937 the petitioner requested from the collector of internal revenue for the district of Louisiana an extension of time for filing his Federal income tax return for the year 1936 and stated that theretofore he had filed his return with the collector of internal revenue in New York but that he was "presently", and had been for the year 1936, engaged in business in New Orleans and that since he had established New Orleans as his domicile he so addressed his application for the extension. The petitioner joined *65 the New Orleans Athletic Club on October 8, 1935 and the Audubon Golf Club (of New Orleans) in 1936. When he was preparing his income tax return for 1936 he was asked by his accountant whether he was a permanent or a non-resident member of any local clubs and was advised to check the matter to see that the membership was resident. Thereupon, the petitioner converted his membership from non-resident to resident by paying back dues to cover resident membership in the Athletic Club from December 1, 1936, and in the Golf Club from May 1, 1936. In connection with his representation of the Whitely Company, the petitioner maintained a suite in the Lexington Hotel in New York City from May 15, 1936, to April 16, 1937. It was not occupied by the petitioner or his wife during that period. The home in Stamford owned by the petitioner's wife and occupied by them both, was closed in October, 1935, and placed in charge of the caretaker, who, with his wife, had quarters over the garage, and who was paid by Mrs. Kastel. The house at Stamford was opened by Mrs. Kastel and the caretaker in the spring of 1936, closed in the fall of that year and reopened in April, 1937. During the winter of 1937 *66 and 1938 it was occupied by Mrs. Kastel's mother and sister. Mrs. Kastel employed the caretaker's wife as a laundress only during the summer time. The house was well equipped with electric appliances, heating apparatus and other conveniences comporting with the requirements of a residence of its cost and character. Mrs. Kastel made 18 deposits in 1936 and 17 in 1937 in the Fidelity Trust Company in Stamford and she entered its safe deposit vault on 20 different occasions during 1937. Mrs. Kastel drove an automobile in Connecticut during 1936 and 1937. It was licensed in her name. On several occasions during the taxable years the petitioner and his wife stayed at hotels in New York City and elsewhere. Their registration card indicated that their address was New York City or Stamford. There was a very close family relationship between Mrs. Kastel and her sister, Elaine, who was 12 years of age in 1936, as well as between Mrs. Kastel and her mother, Mrs. Connor, her sister, Mrs. Pickell, and her brothers, Byron and Rudyard. Mrs. Connor lived in Cleveland, Ohio, and Mrs. Pickell and her husband lived with her. Rudyard Connor died suddenly on April 7, 1936. Following his funeral and *67 pursuant to a plan then agreed upon, Mrs. Connor and Elaine went to Stamford with Mrs. Kastel. Elaine attended a girl's camp during the summer. Mrs. Kastel returned to New Orleans. Elaine went to that city in September, 1936, and Mrs. Connor followed in October. They went to New Orleans because Mrs. Kastel was located there and wanted as many of her family as possible to be with her. Mrs. Connor and Elaine lived with Mrs. Pickell in New Orleans and Elaine entered the Louise McGee School, which she attended during the ensuing school year. Mrs. Pickell moved to New Orleans on May 25, 1936, and took a house on Louisiana Avenue Parkway. Her husband was working in New Orleans at that time. Byron Connor was also working in the city. Mrs. Pickell saw Mrs. Kastel practically every day, except for short shopping trips, during the winter and spring of 1936 and 1937 and also of 1937 and 1938. Mrs. Pickell and Mrs. Connor lived in New Orleans to the date of the hearing, except for trips by Mrs. Connor to Stamford for the summer and during the winter of 1936-37, when Mrs. Connor and Elaine lived at the Stamford house. In the spring of 1938 Mrs. Kastel and Mrs. Connor drove from Stamford to New *68 Orleans. During the taxable years the petitioner was domiciled in New Orleans, Louisiana. Opinion VAN FOSSAN, Judge: The opinion and mandate of the Circuit Court of Appeals for the Fifth Circuit circumscribe the problem inherent in the first issue. The Court held that the finding of the respondent that the petitioner made a return on the basis of a division of its income from Bayou among four partners instead of among two, was tantamount to a charge of fraud and that the burden of proving such fraud was on the respondent, who made the charge. Therefore, in order that the respondent may prevail he must prove that the business operated by Bayou was owned by the petitioner and Costello as partners and that they shared equally the profits of the entire enterprise. He has failed to sustain his burden of so proving. In fact, his own witnesses have strongly supported the petitioner's position that the partnership was originally composed of Kastel, Brainerd, Dudley Geigerman and Harold Geigerman and later, (after Brainerd's death) of Kastel, Dudley Geigerman, Harold Geigerman and Brocato. The partnership in Bayou was not founded on any written instrument but was a verbal agreement *69 under which the business was begun and continued, and pursuant to which detailed books of acount and record were kept reflecting its operations. The respondent cannot, with good grace, criticize the informality of the arrangement since it is precisely the same kind of an agreement as the one which he claims created the partnership relationship between the petitioner and Costello and gave rise to the deficiencies determined by him. It was conceded at the original hearing that all of the profit derived from the operation of Bayou was returned for income tax purposes by the individuals designated as partners in the Bayou returns. However, in his brief, the respondent described an item of $17,280 paid to Henry Lang as "relied upon in part by the respondent in connection with the question of fraud." He also referred to an item of $5,500 "which was treated as a deduction in Murphy's work papers from which the Bayou Novelty Company's 1936 tax return was prepared", and which he charged "the petitioner was unable to explain." Neither item was challenged by the respondent when he accepted the Bayou returns. Both of them were necessarily taken into account in the original return of Bayou. The *70 respondent has failed to prove that these items were improper deductions. He showed by the petitioner, whom he made his own witness, only that the petitioner knew very little about the items. This falls far short of the clear and convincing evidence necessary to prove fraud. Consequently, these items will stand and may be eliminated in our consideration of the question of fraud. It is not necessary to discuss in detail the history of the formation of the Bayou partnership or the contribution made by each partner. It is sufficient to note that Costello, to whom the respondent ascribed the ownership of one-half interest therein, had no part in the launching of the venture, had nothing to do with its operation and received directly from it none of its profits. On the contrary, he specifically and emphatically disclaimed any desire to engage in the business and refused to do so. The petitioner offered to Costello, and the latter accepted, a one-half interest in his share of the profits from Bayou. All of Costello's income derived from Bayou's activities was received through the petitioner. He had no direct contact with the company and on the record here made was not a partner therein. *71 The respondent has cited numerous cases of family partnership to support his position. The case at bar, however, does not involve any family relationship whatever, except the issue of domicile, hereinafter discussed. He has cited , in which Johnson, a gambler, and several others, were convicted of conspiracy to defraud the income tax. The Court then held that there was sufficient evidence to justify the conclusion that the other defendants were "screens" behind which Johnson operated. Here, no such situation appears. The respondent has badly stated that Brainerd and the Geigermans were "screens" behind which the petitioner and Costello operated but he has presented no facts to substantiate that statement. Since the ultimate question is an issue of fact and the burden of proving that the petitioner and Costello were the sole and equal partners in Bayou and that no one else had an interest therein has been imposed squarely upon the respondent by the Circuit Court of Appeals, the record does not justify any conclusion other than that the respondent has failed to sustain this burden. With this finding the element of fraud, as charged by respondent, *72 automatically disappears. Although the above conclusions dispose of the question of the Bayou partnership there is a further question that obtrudes from the facts, and that is the taxable status of the share of the income of Bayou paid to Kastel and by him divided with Costello, Albeit the respondent did not base his determination of deficiency on this ground, it does not follow that the whole deficiency must be disapproved merely because the determination was predicated on erroneous grounds, where, as here, the evidence of record shows it to have been correct in part. ; . We have held that Kastel had a 30 per cent, and later a 40 per cent interest in Bayou and that Costello was not a partner in Bayou. From this it follows that such share was taxable in its entirety (subject to our later ruling as to rights under community property law) to Kastel, irrespective of the fact that Kastel and Costello had an arrangement, or partnership agreement, under which they divided such share between them equally. The share was earned by, paid to, and first belonged to Kastel. The subsequent division *73 with Costello in no wise affected its original taxability to ; ; ; . The next question presented is whether or not the petitioner was domiciled in Louisiana during 1936 and 1937 and therefore was entitled to report his income on a community property basis, Louisiana being a community property State. The Circuit Court of Appeals held that on the original record the petitioner had made out a prima facie case of domicile for 1937. The respondent contends that during the taxable years the petitioner maintained his home in Stamford, Connecticut, and was domiciled in that State. The petitioner agrees that he was so domiciled during the year 1934 and a part of the year 1935 but asserts that in the fall of 1935 he came to New Orleans to enter business there, resided there during 1936 and thereafter and declared his intention of making New Orleans his permanent residence and his home, and that his actions during those years were strictly in accord with that expressed purpose and intent. The testimony of *74 the petitioner and of other witnesses clearly establishes that in the latter part of 1935 he went to New Orleans to investigate the possibilities of starting a slot machine business in that city; that after careful survey and due consideration he determined that the outlook for such a business was promising; that thereupon he and his wife moved to that city; that the house in Stamford, owed by Mrs. Kastel, was closed and placed in charge of the caretaker and thereafter served only as the petitioner's summer home; and that the petitioner declared his intention of making New Orleans his home and of remaining there indefinitely. His subsequent conduct, actions and statements were throughly consistent with his avowed declaration that New Orleans had become his domicile. We need not restate the facts presented elaborately in the record. There is no question that the petitioner and his wife lived in New Orleans from the fall of 1935 through 1937. They purchased no home there. The petitioner stated that he could find no house that suited in all respects. He and his wife preferred to live in hotels. He had the right to choose the kind and character of the home which he elected to constitute *75 his domicile. During a considerable portion of the taxable years he and his wife established apartment housekeeping quarters. They occupied their apartment continuously with the exception of trips and occasional visits. Mrs. Kastel gathered the members of her family about her in New Orleans. Their family ties bound them closely together. Her mother, her two sisters, her brother and her brother-in-law all lived in the city and she was in constant touch with them. Other examples of conduct, such as the location of the petitioner's principal place of business in New Orleans; his registering for the poll tax; his payment of such income taxes only to the State of Louisiana; his execution of leases describing himself as "of the city of New Orleans"; his payment of local taxes, and the establishment of charge accounts, corroborate his contention that he had no intention of living elsewhere during the taxable years. See ; . The petitioner's actual residence in New Orleans during the taxable years, amply proved, is prima facie considered to be his domicile. In , *76 the Supreme Court said: The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary. ; . In , The Supreme Court also said: Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicil. The respondent has submitted evidence tending to prove that the petitioner still maintained his Stamford residence during the years in question. That evidence related principally to the size, cost and character of the Stamford house, to the petitioner's alleged admissions that he was a non-resident of New Orleans and lived at Stamford, and to his testimony referring to his verification of his 1935 income tax return and to his examination before the Grand Jury in New York in 1939. Little need be said concerning the Stamford house. When the petitioner moved to New Orleans, he and his wife thereupon considered and referred to that residence as their "summer home." The record shows that they so used and treated it during the taxable years. Their quarters *77 at the Bienville and Ponchartrain hotels (costing $300 a month and $12 a day, respectively) while in New Orleans, were not out of line with the comforts afforded by the Stamford home. The respondent relied on registration cards and other records of hotels, clubs, etc., to show that the petitioner himself had stated that his residence was elsewhere than in New Orleans. However, in none of such evidence did the petitioner's handwriting appear. The petitioner denied that he directed or authorized the notation thereon that his residence was not in the city of New Orleans. As might be expected, the testimony is not free from inconsistencies, but there are none of sufficient degree to justify a disregard of any evidence. We find nothing in the record which seriously discredits or overcomes the petitioner's affirmative proof that he was domiciled in Louisiana during 1936 and 1937. The clear preponderance of the evidence supports petitioner's claim that he was domiciled in New Orleans during both of the taxable years and he was, therefore, entitled to report his income on the community property basis. Decision will be entered under Rule 50. Footnotes
1. Petitioner did not appear as a witness at the original hearing but was present and testified at length at the rehearing.↩